Good morning, your honors. My name is Michael Bergman. I'm here representing the appellants A.V.E.L.A., Fries, and Mr. Valencia. May the court please. With respect to the pivotal Section 43A claim, appellants believe that the district court applied the wrong case, the wrong test, and obtained the wrong verdict. The correct test for these expressive works is the Rogers test, a test consistently applied in this circuit for over 20 years. Well, I'm not sure you even got an argument about Rogers. I think you waived it. I understand that that's the claim that the appellees are making, your honor. Well, no, I'm not talking about what the appellees say. I'm talking about what you did. First of all, the only time I saw where A.V.E.L.A. mentioned the First Amendment claim was in their answer to the complaint. Then they argued that Rogers ought not apply in their response for the motion for preliminary injunction. And then when 56 moved for summary judgment, you didn't say anything about it. They moved for summary judgment on the Rogers test. I'll look for anything you've said or any of your clients have said about Rogers. Instead, you asserted, we're not talking about that. We're going to talk about likelihood of confusion. So if the district court didn't have any of your good briefing or any good argument about that, why in the devil would we ought to talk about it now? Well, I recognize, your honor, that that is a general rule. However, in this circuit, there are deviations from that general rule. Well, there are exceptions to the rule, but I have a tough time seeing why when you have right there in front of you with facts to be determined and a trial to be had and us to go forward and decide whether Rogers would apply. And we're talking really about whether there is, in effect, any kind of expressive work here at all. And the district court has the chance to make this determination. And you or your client, I doubt you, but the attorney below doesn't say a word about it. I'm having a tough time understanding why I should then make that determination based on this record when I didn't get a chance for the district court to make a record about it. I appreciate that, your honor. But the circuit has previously held, for example, in the Donovan case, that the circuit does not rigidly apply the rule bar. Now, just a minute. I don't want to hear all that because all that is is giving it an exception. Here we have a big question. Is this an expressive work? Nobody looked at it. Nobody took evidence to take facts about it. All we have is some idea on appeal that we're supposed to now come up with this idea. And you want me to make a determination after a jury trial when you and your client went to the whole jury on likelihood of confusion and lost that I now am going to take up another argument you didn't make. Why? Not an exception. In this case, why should it be when I could put facts out there to determine whether there was any expressive work or not? Now I can't. Now I can't even look at it to determine. Your honor, I believe that you can. There were photographs of the T-shirts that were submitted to the trial court. And moreover, your honor, as the court in the Butts case and in the Donovan case made clear. Well, the Butts case doesn't apply. There was no intervening change in law. Rogers has been around forever. Butts had an intervening change in law. Well, that is true, your honor. But the court in Butts did recognize that when dealing with the First Amendment, you're dealing with a right that is a matrix of all other rights. Yeah, and I would have thought that counsel would have raised it when there was a motion for summary judgment dead on. I would have thought so, too, your honor. But there are indeed exceptions. One of the cases that points out the various exceptions is Volcker v. CLR. In that case, the court talked about two exceptions which I believe are directly applicable here. One of them is where review of the issue is necessary to prevent a miscarriage of justice or to preserve the integrity of the judicial process. So I'm supposed to, as an appellate court judge, when I've had a good district judge who is well prepared to know what to do because there was a motion for summary judgment well on point, I'm supposed to reach over the bench and solve your problem when you lost it to the jury based on an argument you didn't make. Is that your plea? It is, your honor, although I wouldn't put it quite that way. Well, I didn't think you would because the honest truth is I was putting it as colorful as I probably could the other way. But I'm having a tough time understanding why there you're going to go. Well, if you really thought that, is that something similar I should do with the aesthetic functionality defense? Did you raise the aesthetic functionality test in the trial court? Pardon me, your honor. Did you raise the aesthetic functionality test in the trial court? No, it was not raised in the trial court, your honor. So it was in your answer, however. Yes, it was. So if it were important just because it's in your answer, you would have thought I should do the same thing? Your honor, I can't speak to the omissions of prior counsel. All I can look at is the fact that we're dealing here with a work, an expressive teacher. Well, I'm not sure it's an expressive work. That's something I have to determine before I can determine what to do with Rogers. Well, your honor, I believe. Nobody is stipulated as an expressive work. I understand that, your honor. But if you consider the work, the Ayers case clearly held that T-shirts are expressive works. They're expressive works when they communicate ideas even with social messages, correct? That's correct. But they're not expressive works when it's just a mere photo or a mere picture. Well, it is an image of Mr. Morley, your honor, but it expresses a great deal. It expresses the beliefs, the views, and the attitudes of Mr. Morley. Well, but it seems to me that even in the district court when you were talking about what it did, you only argued that the T-shirts were his image. You didn't argue that the T-shirts added anything to his message. You argue that it just repeated what he's already said with his image. But aren't we dealing here with a question of law, your honor, as to what the Constitution requires in this case? And I believe that the Constitution requires that the court look at the expressive work. And it is an expressive work. The T-shirts have become a canvas on which generations have spoken of their views, of their criticisms of society. Mr. Morley was an active speaker. He was an icon. He believed in a number of things. Did the T-shirts add anything to his iconic message? I think they do indeed. What did they? You didn't argue that below. What do they add? There was just his image there. Well, but they demonstrate the views and attitudes of Mr. Morley, and that is the reason why consumers buy those shirts, your honor. They want to identify with those attitudes. They want to identify with what Mr. Morley stood for. And I do believe, your honor, that this court has developed a solid line of cases from New Kids through MCA through most recently. What do I do with Judge Bivey's decision in Electric Arts, Inc., where Jim Brown suggested that putting his particular image in the middle of a video was an expressive work? And Judge Bivey said it won't be just with the image. He's got to do something more. And then he found that they did do something more. What do I do with that case? Well, I believe you follow it, your honor. Well, and I don't know what more you did with the T-shirt except throw the picture of Mr. Morley on it. What can be done with a T-shirt? You can show an image. It can express an attitude of feeling the independence of Mr. Morley, his social and religious attitudes, even the legalization of marijuana. That is what Mr. Morley represented. That is what the T-shirt represents. People buy it because they want to identify with Mr. Morley and what he stood for. Was there any evidence of that? Counsel, forgive me for interrupting, but that you've made that statement a couple times today. And, of course, opposing counsels argued there wasn't evidence at trial that people buy those shirts essentially for the image because they want the Morley image. Was there any evidence of that, of why people buy these shirts or don't buy these shirts? I don't think there was evidence as to why people buy the shirts, your honor. I think, frankly, that it's evident. I think, for example, the Woods case, the Tiger Woods case, said it would be naive to believe that people weren't buying it, buying these paintings because of Mr. Woods and what he represented. And I believe that's clear as to why they buy this T-shirt. But the aesthetic functionality test was not raised. I mean, that doctrine wasn't argued. I think aesthetic for the doctrine of aesthetic functionality is alive and well and applicable, frankly, to this case as well. Well, but just a minute. You didn't even argue that. You put it in your answer as an affirmative defense. That's the last we've heard of it. You don't even argue for that on appeal. Your Honor, there are, again ---- I've got to take the arguments you make. You didn't make any argument that this is an aesthetic functionality defense case. It's not in your briefs. I understand that, your Honor. Counsel, if we were to affirm this, how far away would we be from creating a Federal right to publicity? I'm sorry, your Honor. I said if we were to affirm this, how far away would this be from a Federal right to publicity? Well, I think if we were to affirm this decision, it would impair the clear rule of law that this Court has adopted for 20 years. I think maintaining that rule of law, following the precedent of the expressive cases, is important mostly to act as a guideline for future people, for the companies that follow. They should understand that where there is an expressive work, as I believe this is an expressive work, is involved, that there is a different test that is applied. Not the likelihood of confusion test, because that doesn't give sufficient concern and interest to the right of people not to be restrained in their exercise of the First Amendment. It surpasses, I believe, the right not to be confused, and the cases hold that. You know, you're spending all your time on issues. I'm sorry, sir. You're spending all your time, see, on issues that you might say are somewhat remote from what was done at trial. I recognize that, your Honor. Have you been? Are you flicking in the notion that this does not, that this is not really an endorsement? Are you flicking in the notion that the Lanham Act doesn't really cover it? Well. Or are you, are you forgetting, though, that are those conceded there? You think it's an endorsement, but what the heck, the First Amendment should stop it? Or is somebody going to talk to us about whether it really is endorsement at all, whether it's covered, whether it's separate? Your Honor, I don't believe that this was an endorsement by any means. This case is totally distinguishable from the Waits and Wend and Jabbar case. It is a case not involving an advertisement for a product where one might assume that there is an endorsement. It is for a use on the product itself. And that distinction has also been drawn by a number of the cases. Well, they argue that it's. So I take it you're saying the First Amendment aside. We don't care about the First Amendment. We don't even get there. The Lanham Act doesn't protect it. Is that what you're saying now? Your Honor, I believe that the First Amendment rules above all else. I believe that the First Amendment dictates. Let's horror of horrors decide that this panel somehow just isn't going to take up issues you didn't raise in the district court. That leaves you with the issues you did raise, I think, and I guess we're back to endorsement to the Lanham Act, are we not? And the point, Your Honor, is? The point is that you can't win this on the First Amendment argument because it is not before the court, because somehow the judges just don't buy that it's before the court. You can't win it on that. Okay. Shouldn't you talk about what you did argue? I understand what Your Honor is saying. I'm just asking. I'm not saying anything. There are, of course, as we set forth in the briefs, there are a number of reasons why this case is not a proper 43A case. There was no indication of an endorsement. People don't buy. They're arguing association. Pardon me, Your Honor? So they're arguing association. Can you talk about that? Yes. The argument, as I understand it, is that the consumers were the survey showed confusion between the association of this product and the defendants, or the plaintiffs, rather. So can you talk about that? Why was that inadequate? The survey shows a very borderline of confusion. I believe it's a 20% confusion level, which is quite below those that are typically found. Did anything in the survey show that consumers would have made different purchasing decisions as a result of this confusion? Or if they had understood the real status of the association, they would have made a different purchasing decision? I believe that people made the purchasing decision because they wanted to be identified with Mr. Marley. Not because they believe that Mr. Marley, who is 20, 25 years deceased, actually endorsed the fabric of the T-shirt or its makeup or its thread count or anything else. They buy for the reason that they want to emulate Mr. Marley. I was interested in your argument about endorsement. Does the statute 43 ever talk about endorsement at all? I don't believe so, Your Honor. It isn't even there, is it? Endorsement isn't even in the statute, is it? That's correct. The statute instead requires a likelihood of confusion with respect to origin, sponsorship, or approval. Correct? Correct. So how do we get off on endorsement? Well, because it is considered a part of 43A false association. Well, I look at the statute here, and I'm trying to figure out where it is that I can get because there's no endorsement, the thing fails. I didn't see that 43A even asked for an endorsement. All it suggests is that there must be a likelihood of confusion with respect to origin, sponsorship, or approval. And I don't get endorsement there at all. And then I look at what happened here and what the facts are here, and I guess that goes to your third issue when we're talking about whether there's enough sufficient evidence for the jury to find it. And when I find what the statute requires, it seems like there is sufficient evidence. We don't need an endorsement. All we need is sufficient evidence of likelihood of confusion with respect to origin, sponsorship, or approval. Well, Your Honor, the cases generally say that the right of false association, which is also included within 43A, is really the false endorsement as well. All right. Appreciate your argument. Your Honors, I see my time is running up. I urge you to consider the waiver argument under the Donovan case and the fact that this is indeed an expressive work which, under the past 20 years' law of this Court, should be protected, and it is not covered by Section 43A. Thank you, Your Honors. Thank you. Counselor, now, I'm understanding that you're coming up to argue the same side of the argument? That's true, Your Honor. Your counsel, your cohort, didn't left you very much time, 56 seconds. I'm on the same side, Your Honor. I have some different issues. I know you're on the same side, but I'll give you ---- Mr. Bergman spoke for 20 minutes? Yeah. Oh. He's down to 56 seconds. The Chief would say you got 56 seconds and that's all, but I'm not the Chief. I'll give you five minutes. You have a kinder, gentler judge today. It doesn't seem that way, but really. Thank you, Your Honor. My name is John Yates. I'm here for GEM Sportswear, co-defendant and licensee of Avenue LA. My client licensed the image, put them on T-shirts, sold about $2.8 million worth. At the end of the day, we had a disgorgement judgment against GEM for about $413,000, which we have bonded. So we read the briefs carefully and your time is ticking, and your issues are going to be which? Understood, Your Honor. From our point of view, this case is about whether there should be a monopoly right under the Atlanta Act or not. The Ninth Circuit, Second Circuit, the Fifth Circuit, all circuits that I'm aware of that have discussed the issue have said no. That big no takes many different forms. Sometimes it takes the form of non-trademark use. So what issues do you want us to concentrate on? I want you, Your Honor, to concentrate on the issue of whether the 43A claim should have gone to the jury at all. Okay. Why shouldn't it have? It shouldn't have, Your Honor, because it shouldn't exist in this particular set of factual circumstances. That set of factual circumstances is this. The Marley images at issue were concededly not the plaintiff's trademarks. The Marley issues at issue, Marley images at issue were also not the defendant's trademarks. And I point, Your Honors, to this survey, the way it was conducted, and the evidence on every one of Avalay's products, they had their own hang tag, they had a designation of X1X archive. On the plaintiff's products, they had the Marley legal line, and they had a statement somewhere about Zion Rootswear. Those are the trademarks at issue. They're not the Marley images. So there's no Marley trademark. Plaintiff's brief talks about their trademark-like property interests. What should I make out of that? They use that phrase several times. From my point of view, Your Honor, the trademark-like property interest is just a major point of confusion. It confuses courts into applying sleek craft factors to what's really a right of publicity case. This is a right of publicity case. Let's look at factor number one, the strength of the mark. What a minute. You know, there is no mark. There is no Marley trademark here. There's a bunch of pictures of Bob Marley. That's it. There is no mark. So why are we comparing marks? There's no mark to compare. Plaintiffs argue in their brief that, well, look at this. We have this incredible high degree of recognition of Marley. You know, that is so true. Mr. Marley was an icon for all the reasons that plaintiffs has raised. Mr. Bergman has raised it, too. I still remember him.  But the fact that his picture is recognized is a recognition factor. Trademarks are about source and sponsorship and approval factors. There's nothing about the Marley image that suggests that Ab L.A.'s T-shirt, my client's T-shirt licensed to be made from Ab L.A. or the plaintiff's T-shirt indicates anything about its source. And to find the truth of that matter, Your Honors, just go to what the plaintiff said. Mr. Mallon, plaintiff's one of plaintiff's counsel at trial, on page, it's volume 2 of the excerpts that I submitted at page 3, 230, I think it's 233. It's in the brief. But he asked the witness a question to the effect, isn't it true, ma'am, that if I put a mark, the Ab L.A. T-shirt on the rack and put a Zion Rootswear T-shirt on the rack and they both have a picture of Marley, the average consumer can't tell if they're licensed or not. And the answer was yes. That's the answer plaintiffs were seeking. So my – I would like you to answer the question that I asked your cohort, and that is, is there any evidence that consumers made different purchasing decisions as a result of consumer confusion? That is a very, very excellent question, Your Honor, and the answer is no. There is not one whit of evidence. And the only place you would find it is in the Dr. Jay survey. The Dr. Jay's field survey by Dr. Deborah Jay did not address the issue. Well, failing that, counsel, forgive me for interrupting you, but the time is ticking. Failing that, how do – is your position in response to Judge Smith's question that this shouldn't have gone to the jury because the plaintiffs didn't prove damage? Are they damage if consumers don't make a different purchasing decision based upon confusion? It's a simple question, and maybe it's too elementary for you, but I don't get it. It's a question, honestly, Your Honor, that hasn't come up anywhere in this case that I've seen, and I'm familiar with it, but the answer would be no. They didn't – they did not prove damages. Actually, it did come up because there was a disgorgement issue, not a damage issue as to my client. Who's the witness who just testified about – that you just were summarizing about the – would a consumer make a different choice based upon the two shirts and the two tags? Where do I find that in the record? Did you say 233? I think he did say 233. Thank you. It's in the last ten pages of volume number two excerpts on the record. Thank you. Thank you, Your Honor. Thank you for your argument. All right. We'll now hear from 56 Hope and Zion Footwear – Rootswear, sorry. Good morning, Your Honor. I'm going to be handling the 43A issues and most of the substantive issues, and my co-counsel, Mr. Urban, is going to address the interference claim. So I'm reserving five minutes for Mr. Urban. The interference claim really was not talked about by this other side, correct? No. And your name, counsel? Jill Patry, sorry. Thank you. That's all right. Thank you. In terms of the – and there's been a lot of discussion about the 43A, as it should be, because that is the claim that permeated this case. There's no question that it is a viable claim under the Ninth Circuit precedent and under precedent of the Sixth Circuit, because you've got the Rosa Parks case, and the Third Circuit, Cassinda case versus NFL. Counsel, can I get you to back up for me? Because I understand your brief to say you're not making a source or origin claim. Is that right? That is correct. It is an affiliation association claim. Okay. So your brief says approval – you're relying approval or sponsorship, connection or association. Is that right? That is correct. Okay. So can you explain to me exactly what is the association that you're alleging between this photo and the product? The product's the T-shirt, right? Right, right. That there's a likelihood – it's not any association. You still have to prove your case that there is an association and that is judged by likelihood of confusion and the downing factors, which are the modified sleep prep factors for this particular type of case. So the association is, and you saw it in the verbatim responses in Dr. J's, where they're saying, hey, look, we thought it looks like it's licensed. They need to get permission or approval from the estate. What I saw, to be frank, and I want to give you a chance to respond, what I saw looked like a lot, a collection of lay legal opinions. I don't think that's true. And I think that people – because you have to look at the questions in sequence. Okay. So the first question said, who do you think made or put out this particular T-shirt, but you're not making a source or origin claim, right? Right. That's – there's three parts to that survey. Right. One is an origin test. So is my answer – is that a yes? The answer to my question is yes. You're not making that claim. That's right. That's right. It was ancillary. So counsel, why is the first question relevant? Who do you think made or put out this particular T-shirt? I realize the survey was done much before trial, but should I – for purposes of my job, should I consider this first question to be relevant now? No. Okay. And here's why. Because it was – okay. That's okay. I'll take a no. But on – and I just have to get through my questions. No, that's fine. I want to make sure I don't use up too much of your time. Let's focus, then, on the second question. Right. Who do you think gave their permission or approval for this particular T-shirt? This is where it's – I want to give you a chance to respond. These answers feel to me like lay legal opinions. Okay. Do you use this permission or approval in the sense of legal permission or approval or design approval, or what is this? No, it's – look, they're not making legal conclusions. And people buy licensed merchandise because they believe that somebody got permission in the ordinary sense of the word, and that's defined extensively in the Tour 18, the Pebble Beach case. And the Ninth Circuit, actually, in Jada, Toys v. Mattel, found that when someone thinks that someone has permission, that that is actionable. There's two decisions in the Jada v. Mattel case. So if that's the case, now I think I understand your theory, and I appreciate that very much. What do I do about – opposing counsel says that there isn't evidence of consumers making any different purchasing decisions as a result of this association that you're alleging – forgive me, as a result of the confusion that you're alleging. What do I do with that? Well, two things. As a preparatory matter, I don't think that is important, because then what you're saying is we have to show actual confusion. I bought something thinking it was something else, and that's not the test in any jurisdiction of the United States for a Lanham Act. Its test is likely a confusion. So as an initial point, that's not relevant. And even if it were, there is evidence in the record where people are asking, hey, is this licensed? You have retailers questioning Jem and Freeze repeatedly, Freeze in particular, do you have a license to sell these products? So there is evidence of that in the record, but it's not required, because then you're going down a path of we need to show some sort of actual damage or actual confusion, and we do not. Kagan. If – just hypothetically, if these folks were just selling a picture, a picture of Marley, in the stores or wherever, maybe on a postcard, I don't know, or just selling pictures of Marley, does your theory reach to that you could stop them from doing that? I would – that is a – it's an interesting question, because then you go down the path of if I own the copyright to that photo. Never mind copyright. We're assuming it's the facts of this case that apparently whatever photo they were using, he didn't own the copyright. Okay. And anyway, I don't think it's a copyright case exactly, but anyway, he didn't own the copyright. It's in the public domain or else they own the copyright. Whatever you like. They're just selling pictures of Marley. That would be okay? It would really – Or would you stop that on your theory? Well, I think that it could be – there's a potential for it to be okay and there's a potential for it not to be okay. It depends how they're selling it. If it's just a single photograph of Bob Marley is in with nothing else around Right. Well, if it's a stack, a package, then you're selling effectively Bob Marley. It's a whole stack. You can buy them separately. Okay. If you buy them separately, then we may not be able to object on that basis. You may not or you could not. Well, again, you're – the problem is we've still got any issue under the Lanham Act. You've got to look at several factors and how they're sold and what's being done. So to answer in the abstract, and I'm not being evasive by any means, is very difficult to do. I would have to look at how it's being packaged and marketed in the marketplace. It's in the market. If at Walmart, instead of slapping it on a T-shirt, they're just putting it in a bin. Then there's a chance that we would and could be able to stop that use. Because? Because they're selling basically Bob Marley. It's Bob Marley is the – that is theirs. It's under copyright protection to them or not, or it's in the public domain, and they're just selling Bob Marley pictures. And, you know, we hear a lot of talk about, well, you know, if you've got a picture of Bob Marley, then you've got his whole philosophy. You've got a whole book of philosophy. Whatever. The point is they're selling a picture of Bob Marley. And it seems to me like you're saying, yes, your theory reaches that far. You could stop it. I can't take a definitive action on that. You may be able to stop it if they dare to sell it in a bin at Walmart. Then maybe you can stop it. Maybe. If – let me give you – let's take the other side of your example. Let's say there is an art show and somebody has photographs of Bob Marley and they're selling single photographs of Bob Marley. I do not think that we would be able to stop that. Because it's at an art show as opposed to Walmart. You can stop it at Walmart but not at art shows. Is that what you're saying? That would be a situation that would be harder to stop for us versus something where it's Walmart, it's a product, it's packaging. Because as a matter of law, if you sell a picture of Bob Marley at an art show, it's okay. If you sell it at Walmart, it's not okay. And there's some reason for that to it. Because I'm talking in the abstract. I don't know how either one is selling it. I cannot possibly determine each factor of how it would be. But that – because I think what you want me to say is that – But if they put it on a T-shirt at the art show, that would be different. That would be a problem. That would be a problem. Because it's merchandise. Gotcha. Absolute merchandise on that. And there are other cases where it's been applied to products. And that's the Wendt case. The Cheers characters were part of the bar. They were not part of the advertising. It was part of the decor of the bar. It's sort of like when you go into TGI Fridays, and that's part of the decor, and that's what brings people into it. That was the Wendt case, and that was Ninth Circuit. Parks versus LaFace, that was a name used as a title of song. The celebrity, Rosa Parks' image, our name, was the product. The loop toys, that was an action figure. That was out of the Second Circuit. So it's not like you're taking a quantum leap here on this issue. But it would be new law, isn't it? Isn't that right? Aren't you asking us to make new law? No. Because you've already got precedent that shows new law would have been Wendt then. Because Wendt said, hey, look, you took characters and you made that part of your product. Now, what makes it a little bit different is that it's a service because it's a bar versus something tangible. But the loop applied 43A to an action figure. That's akin to what we've got here. And it's not just T-shirts, by the way. It's bobbleheads. It's beach towels. It's stickers. It's plush toys. It's a large category. We just tested T-shirts in terms of the survey. So don't be led down the path that this was only a T-shirt case, because it's not. Are you claiming a trademark interest? A trademark-like interest. Right. What's that mean? Your brief repeatedly says trademark-like property interest. And we're taking that straight out of the cases. Rosa Parks, Wade. I appreciate that. Just can you explain to me what it is exactly that you're claiming and not claiming? Okay. I'm not claiming a static image of – and we do – and it was part of the record. There's a Tuff Gong and Design registration that has a picture of Bob Marley in the middle of the star. And that was introduced at trial not as the basis of a trademark infringement claim, but as a basis to show that we have a protectable right under the 43A problem. I'm claiming – we are claiming that Bob Marley's persona as a whole is in – that the family, 56 Hope Road, owns an economic interest in his persona as a whole as opposed to one static image. We obviously own registrations for his name. We own a registration for a particular image, which is included in the Tuff Gong. We have more that have issued since this case. How is an economic image in Mr. Marley's – sorry, an economic interest in Mr. Marley's image different than a federal right to publicity? It's very different. And I – this was one of the points that I made to the jury is – let me give you the example. A right of publicity claim can be made by anyone. Someone takes a picture. You get married. They take a picture. And they put it in a wood frame. They start selling those frames with your picture of the couple in that thing. Now, you can have a right of publicity claim against the company, the guy who took your photo and then sold it to the manufacturer that's making the picture frames, even though you're not famous. You only get a 43A claim if you can show that you have a protectable interest, which means that you have – you've policed your rights. You have done licensing. That's another example of having an economic interest. And you've got to show that there's a likelihood of confusion. You don't need to show that on a right of publicity. And a third point is a right of publicity is a creature of State law. So if you get a right of publicity successful claim in Nevada, you're enjoining in Nevada. 43A, you're enjoining throughout the U.S. and its territories. So it actually is different. It's a more stringent test. It's not for everybody. And the same types of defenses would apply. Trademark-like defenses would apply to a 43A claim. So it's not that – And the difference between that kind of a claim and a right of publicity. That's correct. And the first element, because that was the Lady Dye cases, that she didn't have any economic – She hadn't policed her rights. Yeah, exactly. And that's why we spent so much time showing it wasn't by happenstance that we went through all of the licensing and various products that Zion Rootsware put out, that Balls Out, which was the former licensee, Whole Road was part of Balls Out, which was the second licensee. But Bob Marley had started licensing – his family did in 1986, and then 81 is when he passed away. But before he even passed away, he did it. So it's both in that case. It is very different. Would you take time – and I realize you're going at the issues that were really before the district court and that the district court really focused in on, and that's what we had a trial about. But would you take time, just a few minutes, and tell me why I shouldn't just jump to conclusions that the First Amendment ought to end this case right now? And I appreciate what you said about the waiver, because we wholeheartedly agree with you. But these products are not expressive works. And, again, it's not just a T-shirt. I'm not sure how a plush toy becomes an expressive work or a beach towel. The evidence in the record was the use of Bob Marley's persona, his images, and his music titles. And there was nothing added to that – no words of wisdom by Bob Marley or anything that would say that. And I'm sitting here thinking, because I love T-shirts. I'm like, what T-shirt do I have that would be a good example? And I have one that says, I'm not afraid to run with scissors. I'm saying something. That's my communication. There's nothing of that sort here. They're simply pieces of Bob Marley's music titles or a picture of him alone. So they're not expressive. You don't even reach that aspect. The aesthetic functionality, in addition to being not – I don't think it was specifically plagued, by the way. They're trying to – and maybe it's true I haven't looked into this issue in detail, but they allege that it's ornamental. And they have to make the equation, then, that an ornamental defense is actually a – is the equivalent of aesthetic functionality. And I'm not sure that it is. So they're stretching, they're pleading to get to – to indulge you to rule on issues that were not before the Court. Your brief argues that Job's Daughters has been significantly undermined. But is it just the Automotive Gold case you rely on for that?  Oh, the Automotive v. Gold. Is that the only case that you rely on for this – for your assertion that the aesthetic functionality test has been significantly undermined? It's that plus the – what had happened in the Fleischer Studios case v. Ave. L.A. There was a Ninth Circuit decision that was withdrawn. So it's those two things. And by the way, I don't think this was in our brief, but I wanted you to have this, too, if needed. There was another case, Bruce Lee Enterprises v. Ave. L.A. that was decided by the Southern District of New York in its 2013 U.S. District Lexus 31155. Could you say that again? Sorry. Sure. It's 2013 U.S. District Lexus 31155. And there the – it was Kimball Wood, Judge Woods, who distinguished the Peroni case and said that 43A was actionable and against this same defendant and agreed with the Downing factors for the Ninth Circuit on that front. I want to just – I'm running into Mr. Irwin's time, but I did want to just touch briefly on the – an important issue was the – whether the jury should decide profits. And that was something that I think that – I think you can decide that in our favor, that it should have been – should have gone to the jury because it's not a situation where we waived it. Our position is we have a constitutional right to the jury, and we have that under Dairy Queen, which was not just a breach of contract case. It was apparently a very poorly worded complaint, but it was a breach of contract and trademark infringement because it was a holdover licensee. And the Ninth Circuit in Sidcroft – Sid and Martycroft v. McDonald's, that was in 1977, discussed that, and I'm not sure how – even though that was a copyright case, it went into it and it said that we believe that the plaintiffs had a right to a jury trial. In that case, they waived it in the pretrial. Both sides agreed, and then the defendant came back and said, wait a minute, the profits should have gone, and we said, hey, look, you waived it. So I think that there's an error that – what the district court said was it could go either way and I make the call. I decide whether you can enforce your constitutional right to jury, and I think that was a reversible error on that. It was an interesting issue, but not – Well, we're really talking about whether it's a legal decision or equitable, aren't we? Right. But an issue of profits – I understand. And if it were an accounting for profits, I think that might be legal, but I'm just having trouble suggesting that there is any law that says that the calculation of the profits itself got to be the jury, especially when I look at 15 U.S.C. 1117a. Well, here's the interesting thing about 1117, is that the court's discretion applies to both actual damages and profits. And if you read the – and our view is that goes to whether you can have additure or remititure after a jury decision, because then if you're saying that that makes it only an equitable claim of profits, well, how do you get around the fact that 1117 also applies to actual damages, the court's discretion? And I would direct you to the Sid and Mardikoff page 1174 through 75 is the discussion about that. Well, I understand. And I frankly focused in on that Seventh Amendment right as well, very seriously. So I wanted to ask you my biggest question in that regard. Thank you. I've got a minute 40 for – Yeah, you've got a minute 40 for a guy. If they didn't say anything about it, he should be able to handle it in a minute 40. Okay. Thank you, Your Honor. May it please the Court. My name is Timothy Urban, and I represent Zion Bootswear and Hope Road. Very quickly, on the interference claim, there certainly was substantial evidence in front of the jury from which they could have fined that the interference with the prospective business relationship. Specifically, if you look at the testimony that was offered by Mr. Raban, where he said Mr. Valencia, in language much more colorful than I'll use here, was going to flood the market with goods. And that was contemporaneous with the preliminary injunction hearing where we were attempting to stop them from selling goods in Target. And it was revealed that we were going to start to sell to mass market at that time. And the evidence was in front of the court and in front of the jury  which equated to $306,000 in royalties that would have been paid to the family. And if you look at that, that is substantial evidence, Your Honor. We also submitted evidence of an additional $117,000 that was lost through C&D, Visionary, Wet Seal, JCPenney, and Kohl's. And again, Liza Kuna, his licensing agent, testified very clearly that she monitored the market, was aware that we were selling to those and those retailers then switched out our licensed product and started selling their product. And then very quickly, on the punitive damage claim, Your Honor, this is reviewed de novo by this court. Saman v. Robbins-Tyre speaks to that. The jury here found the intentional conduct when it ruled in favor of Zyphus or at Hope Road on the interference claim. And the White House... Well, there's no question the jury found willfulness, right? Correct. But that's the imposition of punitive damages just based on willfulness? No, and it's more than that. It's clear and convincing evidence. And I think, again, in most cases you have to infer based upon the conduct of the defendant. Here you have direct evidence from Mr. Robbins, a contemporaneous statement that's made by Mr. Valencia of what his intentions are. He's going to flood the market with goods to prevent us from being able to devalue the brand. You don't normally have that. That is certainly clear and convincing evidence that the jury should have been able to consider and determine whether or not a punitive damage award was viable. All right. I appreciate your input. Thank you. I think we gave you extra time for your argument this time. And I think we've tried to give them close, but they didn't get an extra five minutes or so. So I think we'll just submit this case unless there are any further questions from my colleagues. All right. The case 12. Cases 12, 17, 502, 519, 595, 15, 407, and 473, 56, Hope Road Music, and Zion Root Swear v. Avala, I thought it was. But I heard you say it just a little bit different. It's submitted. Thank you very much. The court is adjourned.
judges: FERNANDEZ, SMITH, CHRISTEN